**[J-16-2022]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**BAER, C.J., TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| SYNTHES USA HQ, INC., | : | No. 11 MAP 2021 |
| | : | |
| Appellee | : | Appeal from the Order of |
| | : | Commonwealth Court at No. 108 FR |
| | : | 2016 dated July 24, 2020, Judgment |
| v. | : | Entered January 21, 2021, |
| | : | Reversing the decision of the PA |
| | : | Board of Finance and Revenue at |
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 1409195 dated January 13, |
| | : | 2016 and Remanding. |
| Appellant | : | |
| | : | ARGUED:  March 10, 2022 |

**OPINION**

JUSTICE DONOHUE                                    DECIDED:  February 22, 2023

In this corporate income tax case, we are presented with two discrete questions of law.  First, we consider a threshold issue questioning the authority of the Pennsylvania Office of the Attorney General ("OAG") to represent the Commonwealth in this litigation, where it asserts an interpretation of the relevant tax provision contrary to the reading forwarded by the Pennsylvania Department of Revenue ("Department").  The second question requires our interpretation of a provision of the Tax Reform Code of 1971 ("Tax Reform Code") allocating a corporation's sales of services between Pennsylvania and other states for purposes of calculating the corporation's income that is taxable in Pennsylvania.  After review, we conclude that the Commonwealth Attorneys Act permits the OAG to take a position on behalf of the Commonwealth that is inconsistent with the position adopted by the Department, but we ultimately reject the OAG's reading of the

relevant tax provision in favor of the interpretation presented by the Department. Accordingly, we affirm the order of the Commonwealth Court remanding this case to the Board of Finance and Revenue for calculation and issuance of a tax refund by the Department to the corporate taxpayer, Appellee Synthes USA HQ ("Synthes"), for the 2011 tax year.

As explained in detail below, this case centers upon how Synthes should apportion its income between Pennsylvania and other states in order to calculate its Pennsylvania corporate net income tax. To determine the Pennsylvania income tax for a corporation doing business in multiple states, the Tax Reform Code for the 2011 tax year employed an "apportionment factor," which in turn derives from three other factors: sales, property, and payroll. 72 P.S. § 7401(3)2.(a)(9)(A). As is relevant to the case at bar, the "sales factor" is the ratio of "total sales of the taxpayer in this State" compared to the "total sales of the taxpayer everywhere." 72 P.S. § 7401(3)2.(a)(15).[1] Accordingly, the Tax Reform Code necessitates categorization of which sales are "in this State," or in the parlance of the parties, which sales should be "sourced" to Pennsylvania.

The Tax Reform Code provides separate instructions for different types of sales. The dispute before this Court relates to the allocation of Synthes' sales of services. As applicable to sales of services for the 2011 tax year, the Tax Reform Code instructed,

> (17) Sales, other than sales of tangible personal property, are in this State if:
>
> (A) The income-producing activity is performed in this State; or
>
> (B) The income-producing activity is performed both in and outside this State and a greater proportion of the income-producing activity is performed in this State than in any other state, based on costs of performance.

---

[1] The parties do not dispute the calculation of Synthes' property and payroll factors.

72 P.S. § 7401(3)2.(a)(17) (amended 2013) (hereinafter "Subparagraph 17").

Neither the Tax Reform Code nor the Department's regulations define "income-producing activity" or "costs of performance." To fill this void, the parties offer interpretations of these terms in support of categorizing sales based either upon the location where the taxpayer produces the service, as advocated by the OAG, or conversely the location where the customer receives the benefit of the service, as proffered by the Department. The parties refer to the OAG as employing a "Cost of Performance Method" and the Department as utilizing a "Benefit-Received Method."[2]

While the parties contest the interpretation of the Tax Reform Code, they stipulated to the relevant facts set forth herein. For purposes of the 2011 tax year, the parties agreed that, while Synthes had business activity and paid taxes in multiple states, it was headquartered and maintained its principal place of business in Pennsylvania. Synthes sold research and development services ("R&D services") and management services to its affiliates. The management services included "(1) information technology support service; (2) accounting service; (3) human resource service; (4) legal support service; and (5) purchasing service." Stipulation of Facts at 5-6, ¶ 21.

In 2011, Synthes sold its R&D services to only one customer, Synthes USA LLC, which is a medical device manufacturer. The parties stipulated that "Synthes USA LLC received the benefit of R&D Services at locations in Pennsylvania, Colorado, New York, and in foreign countries where third-party contract manufacturers are located." *Id.* at 4,

---

[2] We observe at the outset that these sourcing methods have also been disputed in other states given that Pennsylvania's statute derives from a uniform act adopted in numerous states. Courts and parties have utilized different terminology to describe these sourcing methods. Broadly speaking, the methods either source the sales of services to the origination point of the services, which is often the taxpayer's place of business, which we generically term "origin" sourcing, in line with the OAG's view, or to the location where the customer receives the service, which has been termed "market" or "destination" sourcing, as advocated by the Department. In this opinion, we utilize both the parties' specific terminology as well as the more generic terminology.

¶ 15. To produce its R&D Services, Synthes incurred costs in the form of "wages paid to employees and other employee-related costs; costs to purchase and maintain equipment and supplies; costs to operate and maintain research labs; and overhead costs (administrative costs, lighting, building systems, etc.)." *Id.* at 4, ¶ 13. While these costs were incurred in multiple states, "the greater proportion of [Synthes'] costs for providing R&D Services to Synthes USA LLC was incurred in Pennsylvania ... ." *Id.* at 4, ¶ 14.

For its management services, Synthes had three customers in 2011: Synthes USA LLC; Synthes USA Sales LLC; and Synthes Canada, LTD. The parties agree that these customers received the benefit of Synthes' management services in every state, including Pennsylvania, and in Canada. Synthes incurred the same categories of costs in producing its management services as listed for its R&D services (other than research lab costs), the greater portion of which were incurred in Pennsylvania.

In its initial 2011 tax return, Synthes calculated its sales factor by applying the Costs of Performance Method, sourcing all of its sales of services to Pennsylvania. In April 2014, Synthes timely filed a petition to the Board of Appeals for refund of a portion of its 2011 corporate income tax.[3] Synthes sought to recalculate the sales factor by employing the Benefit-Received Method. Specifically, Synthes sought to exclude from the sales factor numerator the sales of services where the benefit was received by its customers outside of Pennsylvania. Synthes petitioned for a refund of approximately $2 million plus interest. Stipulation of Documents at 23 (Exhibit G: Board of Appeals Petition, unnumbered).

---

[3] Synthes filed petitions for refund in relation to its 2010, 2011, and 2012 tax returns, seeking a total refund of approximately $10.7 million. Pursuant to the parties' joint application, the Commonwealth Court stayed the proceedings related to 2010 and 2012, pending disposition of the refund petition for the 2011 tax year, which is currently on appeal to this Court.

The Board of Appeals sought additional documentation to support Synthes' petition. In April 2015, after reviewing the documents submitted by Synthes, the Board of Appeals denied the refund. While the Board of Appeals agreed with Synthes' use of the Benefit-Received Method, it nevertheless denied the petition concluding that Synthes failed to provide the necessary evidentiary support for its asserted allocation of its sales of services.

In May 2015, Synthes appealed the Board of Appeals' decision to the Board of Finance and Revenue, reasserting its claim to a refund based upon use of the Benefit-Received Method. Synthes argued, inter alia, that the Uniformity Clause of the Pennsylvania Constitution required application of the Benefit-Received Method, given the Department's long-standing practice of applying that sourcing method to other corporate taxpayers.[4]

The Board of Finance and Revenue denied Synthes' petition for refund in January 2016.[5] Without speaking to the proper sourcing method or the merits of Synthes' Uniformity Clause claim, the Board of Finance and Revenue concluded that Synthes failed to meet its evidentiary burden to demonstrate that its receipts derived from income-producing activities in states outside Pennsylvania, as was required to trigger application of Subparagraph 17(B).

In February 2016, Synthes filed a petition for review of the Board of Finance and Revenue's order in the Commonwealth Court, naming the Commonwealth of

---

[4] The Uniformity Clause of the Pennsylvania Constitution instructs that "[a]ll taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws." PA. CONST. art. VIII, § 1.

[5] The Board of Finance and Revenue addressed Synthes' 2010 and 2011 refund petitions in companion decisions. The 2011 decision at issue in this case incorporates the reasoning set forth in the 2010 decision, which we set forth herein.

Pennsylvania as respondent as required by Pa.R.A.P. 1571(c).[6]  As before the other tribunals, Synthes sought to exclude from the sales factor numerator all receipts from sales of services "where the benefit was received outside Pennsylvania."  Petition for Review ¶ 10(c)(ii).  It reiterated that failure to grant recalculation would violate the Uniformity Clause as its income would be "apportioned to Pennsylvania in a greater concentration than other similarly situated taxpayers."[7]  *Id.* at 10(d)(iv)(B).

Following various proceedings and Synthes' submission of additional information, Synthes and the Commonwealth, as represented by the OAG, filed a joint stipulation of facts and stipulation of documents in November 2019.[8]  The parties stipulated that, if the Benefit-Received Method applied, then Synthes would be entitled to a refund of $2,138,271.00 for the 2011 tax year but that no refund would be issued if the Costs of Performance Method applied.  Stipulation of Facts at 18 ¶ 70-71.

The parties agreed that the Department has utilized the Benefit-Received Method as a "consistent and deliberate policy and practice," explaining that the Department interpreted the term "'income-producing activity' in Subparagraph 17 as the receipt of the benefit of the taxpayer's service," which it deemed to occur "at the customer's location." *Id.* at 9, ¶ 37.  While recognizing the practice, the parties stipulated that the Department

---

[6]  Rule 1571(c)(4) instructs that "[a] petition for review of a taxpayer or similar party shall name the 'Commonwealth of Pennsylvania' as respondent ... ."  Pa.R.A.P. 1571.  Rule 1571(d) further requires the petitioner to "serve a copy of the petition on the Board of Finance and Revenue and on the Attorney General."  *Id.*

[7]  Synthes raised additional constitutional challenges under the federal constitution which are not before this Court.  As we ultimately agree with Synthes that the Benefit-Received Method should be applied to its 2011 tax return, we do not delve into the details of its Uniformity Clause or other constitutional claims.

[8]  The parties stipulated to the facts in conformance with Pa.R.A.P. 1571(f) which dictates that, in appeals from the Board of Finance and Revenue, "the parties shall take appropriate steps to prepare and file a stipulation of such facts as may be agreed to and to identify the issues of fact, if any, which remain to be tried."

did not publish formal guidance on the use of the method until 2014. *Id.* at 10, ¶ 40; 14, ¶ 54; s*ee* Pa. Dep't of Revenue, Information Notice – Corporation Taxes 2014-01. Moreover, the parties detailed that the Department did not promulgate any regulations regarding use of the Benefit-Received Method. Stipulation of Facts at 15, ¶ 56.

The parties further stipulated that the Benefit-Received Method has been consistently approved by the Auditor General and applied in the Board of Appeals' decisions, which in turn have been "consistently affirm[ed]" by the Board of Finance and Revenue. *Id.* at 10-11, ¶ 43-48. However, the parties agreed that taxpayers appealing from the Board of Finance and Revenue to the Commonwealth Court "typically settled their matter on a compromise basis with the Office of Attorney General," ultimately agreeing to a tax between the amounts calculated under the Benefit-Received Method and the Costs of Performance Method. *Id.* at 12, ¶ 50(D); 13, ¶ 51(D); 14, ¶ 53(C). Indeed, the Commonwealth Court subsequently observed that the current appeal is the first Pennsylvania appellate case to address the issue presented as all prior cases have resulted in settlements. *Synthes USA HQ, Inc. v. Commonwealth*, 236 A.3d 1190, 1196 (Pa. Commw. 2020).

After Synthes filed its initial brief as appellant seeking application of the Benefit-Received Method and reasserting its Uniformity Clause claim, the OAG, representing the Commonwealth, filed a brief arguing for utilization of the Costs of Performance Method and the denial of a refund to Synthes. Thus, the OAG's argument conflicted directly with the Department's long-standing use of the Benefit-Received Method, which the OAG asserted was unsupported by the plain language of Subparagraph 17. In so doing, the OAG emphasized that the Attorney General was an independent, elected entity, separate from the Department, with statutory authority under the Commonwealth Attorneys Act to "represent the Commonwealth" "in any action brought by or against the Commonwealth,"

71 P.S. § 732-204(c), and to "defend the constitutionality of all statutes[,]" 71 P.S. § 732-204(a)(3).

In response, the Department filed an application to intervene pursuant to Pa.R.A.P. 1531. The Department acknowledged that it had not filed within 30 days of Synthes' petition for review as required for intervention as of right under Pa.R.A.P. 1531(a).[9] It contended, however, that intervention by permission was proper given that it had been a party before the lower tribunals and had sought intervention within two weeks of becoming "fully aware" that the OAG was advocating an interpretation contrary to the Department's long-standing interpretation of Subparagraph 17.[10] Dep't Brief in Support of Intervention at 7. Moreover, it contended that no prejudice would result from its intervention as it had sought intervention prior to the Commonwealth Court listing the matter for oral argument.

In seeking intervention, the Department asserted that it had a substantial, direct, and immediate interest in the proceedings and that its interests were not represented by the parties. It emphasized that it is the agency with authority to administer the Tax Reform Code and that it had been a party to this litigation before the Board of Finance and Revenue. It further observed that the OAG was contesting the validity of the Department's application of Subparagraph 17 for the first time in the case and that the OAG stated that it did not represent the Department. The Department highlighted that Synthes was advocating only for its refund and not for the Department's statutory interpretation. As

---

[9] Pa.R.A.P. 1531(a) provides that "[a] party to a proceeding before a government unit that resulted in a quasijudicial order may intervene as of right in a proceeding under this chapter ... by filing a notice of intervention ... within 30 days after notice of the filing of the petition." Alternatively, "permission to intervene may be sought by application" after the thirty-day period. *Id.*

[10] The parties dispute when the Department was aware of the OAG's intent to present the Commonwealth Court with a divergent interpretation of Subparagraph 17. The Department contends that they were fully aware only when it received the OAG's brief in January 2020, while the OAG avers that it alerted the Department to its intent to present its contrary interpretation as early as May 2017. *See* OAG Exceptions at 2, ¶ 3.

developed below, the Department additionally set forth its argument on the merits of Synthes' refund claim, defending its use of the Benefit-Received Method.

Synthes initially objected to the Department's intervention, asserting prejudice due to expected delay, but did not object to the court's accepting the Department's brief on the merits as an *amicus curiae* brief. At oral argument, it withdrew its objection to the Department's intervention.

In June 2020, the Commonwealth Court heard argument *en banc* on the Department's application to intervene on the same day it heard the merits of Synthes' appeal. In its opinion, it granted the Department's application to intervene, concluding that the Department had a clear interest in the litigation and that the other parties did not assert that prejudice would result from the grant of intervention.

In so doing, the Commonwealth Court included a footnote addressing the OAG's representation of the Commonwealth in which it noted "with dismay the Attorney General's assertion in this case of a legal position directly adverse to that of its client, the Department." *Synthes USA HQ, Inc.*, 236 A.3d at 1195 n.12. The court recognized that the OAG was tasked with representing Commonwealth agencies, such as the Department, under the Commonwealth Attorneys Act (herein after "CAA" or "the Act"), 71 P.S. §§ 732-101–732-506.[11] It questioned, however, whether "any constitutional or statutory authorization or mandate" existed for the OAG to present an argument contrary to the Department, where the agency had not sought the OAG's legal advice as

[11] For ease of discussion and in conformity with the parties, we will reference the sections of the Commonwealth Attorneys Act by the sections of that act. In critical part, Section 204(c) provides that "[t]he Attorney General shall represent the Commonwealth and all Commonwealth agencies." 71 P.S. § 732-204(c).

contemplated under Section 204(a) of the Act.[12]  *Synthes*, 236 A.3d at 1195 n.12.  The court, instead, reasoned that, "to the extent the Attorney General believed itself entitled to control the position to be advocated in [Commonwealth] Court, and upon reaching a legal interpretation contrary to that of the Department, the Attorney General should have so advised the Department[,]" which would have allowed the Department to seek declaratory relief under Section 204(a) of the Act.  *Id.*  Alternatively, the court opined that the OAG "could have authorized counsel for the Department or the Board to litigate this matter" pursuant to Section 204(c), to avoid "this unseemly conflict between the Commonwealth and its own agency concerning a statutory construction issue within the agency's expertise."[13]  *Id.*

Turning to the merits of the tax question, the Commonwealth Court first deemed the language of Subparagraph 17 ambiguous, given that the critical terms of "income-producing activity" and "costs of performance" are undefined and the OAG and the Department presented reasonable but contrary interpretations.  *Id.* at 1201.  In addressing this ambiguity, the court cited its caselaw providing for deference "to the expertise of the agency charged with interpretation and enforcement responsibilities" of the relevant statute unless the agency's interpretation "is erroneous or frustrates the legislature's intent."  *Id.* at 1201.  The Commonwealth Court concluded that the Department's use of

---

[12]  Section 204(a), is entitled "Legal advice," and provides a process for the Governor or the head of any Commonwealth agency to seek legal advice from the Attorney General, which is then binding in most circumstances absent declaratory judgment from the Commonwealth Court.  71 P.S. § 732-204(a)(1)-(2).  The parties stipulated that the Department had not sought the OAG's legal advice regarding the use of the Benefit-Received Method.  Stipulation of Facts at 15, ¶ 58.

[13]  Then-Judge, now Justice, Brobson joined the Commonwealth Court majority but wrote separately to highlight his view that the OAG "overstepped its authority under the [Act] by assuming the mantels of both counsel and client."  *Id.* at 1202-03 (Brobson, J., concurring). He would have reversed and remanded for issuance of a refund, without addressing the OAG's challenge to the interpretation of Subparagraph 17.

a Benefit-Received Method was neither erroneous nor contrary to legislative intent. *Id.* at 1202.

In so doing, the court rejected the OAG's interpretation of a 2013 amendment to the Tax Reform Code, which added Subparagraph 16.1 for tax years beginning in 2014. As discussed in detail below, Subparagraph 16.1 explicitly applies destination sourcing to sales of services by allocating such sales to Pennsylvania "if the service is delivered to a location in this State." 72 P.S. § 7401(3)2.(a)(16.1)(C). While the OAG viewed the amendment as changing the treatment of sales of services from that previously provided in Subparagraph 17, the Commonwealth Court instead interpreted the addition as legislative acquiescence to the Department's longstanding interpretation. *Synthes USA HQ, Inc.*, 236 A.3d at 1202. It, therefore, deemed the Legislature to have "clarified, rather than altered" the statute. *Id.* The court, thus, reversed the Board of Finance and Revenue's denial of a refund and remanded to the Board "for issuance of a tax refund to Synthes USA HQ, Inc. for tax year 2011, in an amount to be determined by the Department consistent with the foregoing opinion."[14] *Id.*

Judge Wojcik authored a concurring and dissenting opinion, joined by Judge Cohn Jubelirer. These jurists concurred with the majority's grant of intervention to the Department but diverged from the majority as they read the Commonwealth Attorneys Act to provide authority for the Attorney General's actions in this case. They stated that the Act "clearly and explicitly confers upon the Attorney General the primary authority" to determine the interests of the Commonwealth and "specifically contemplates dual representation of the agencies where those perceived interests are conflicting." *Id.* at 1205 (Wojcik, J., concurring and dissenting). The jurists cited *Fidelity Bank v.*

---

[14] As the Commonwealth Court granted the relief sought by Synthes, the court did not address Synthes' alternative claim under the Uniformity Clause.

*Pennsylvania Turnpike Commission*, 444 A.2d 1154 (Pa. 1982), as supporting their interpretation of the Act.

Turning to the merits of the tax question posed, the jurists dissented from the majority's approval of the Department's use of the Benefit-Received Method, instead finding that method inconsistent with the language of Subparagraph 17. The responsive opinion viewed the 2013 amendments as demonstrating legislative intent to alter the sourcing method by adding Subparagraph 16.1, which unambiguously applied destination sourcing for sales of services, while retaining the distinct language of Subparagraph 17 for all other sales not addressed in Subparagraphs 16 or 16.1. The responsive opinion favored affirmance of the Board of Finance and Revenue's denial of Synthes' refund petition.

The OAG and Synthes timely filed exceptions to the Commonwealth Court's decision pursuant to Pa.R.A.P. 1571(i), to which the Department responded. The OAG filed an application to waive briefing and argument on the exceptions, which the Commonwealth Court granted on January 21, 2021. In the same order, the court directed the prothonotary to enter its July 2020 order as a final order and to enter judgment.

The OAG filed a notice of appeal challenging the Commonwealth Court's order entered January 21, 2021, and the final order entered July 24, 2020. It additionally filed a statement with this Court, asserting that jurisdiction was proper based upon 42 Pa.C.S. § 723(b) and Pa.R.A.P. 1101(a)(2).[15] While Synthes filed a no answer letter in response to the OAG's jurisdictional statement, the Department contested jurisdiction, seemingly raising a challenge to the OAG's standing.

---

[15] Section 723(b) addresses "Board of Finance and Revenue matters" and provides that "[a]ny final order of the Commonwealth Court entered in any appeal from a decision of the Board of Finance and Revenue shall be appealable to the Supreme Court, as of right, under this section." 42 Pa.C.S. § 723; *see also* Pa.R.A.P. 1101(a)(2) (addressing appeals to the Supreme Court from Board of Finance and Revenue decisions).

In support of this position, the Department contended that the OAG was neither a party in the proceeding below nor was it aggrieved by the Commonwealth Court's decision. The Department explained that the OAG was not involved in the case before the Board of Appeals or the Board of Finance and Revenue. Moreover, the Department dismissed the OAG's attempt to establish the "Commonwealth" as a stand-alone party separate from the Department, which it viewed as the OAG's "cut[ting] out of whole cloth this new client as a vehicle for OAG's arguments." Dep't Answer to Jurisdictional Statement at 3. According to the Department, the OAG also was not aggrieved by the Commonwealth Court's order, which instructed the Board of Finance and Revenue to direct the Department to issue a refund to Synthes and did not order the OAG or the Commonwealth to do anything. For these reasons, the Department asks this Court to dismiss or quash the appeal.

Following review, this Court noted probable jurisdiction and subsequently granted limited oral argument to address, firstly, the authority of the OAG to represent the "Commonwealth" and present a statutory interpretation contrary to the long-standing interpretation of the Department and, secondly, to address the merits of the statutory interpretation of Subparagraph 17.[16] We address these distinct issues separately, turning first to the OAG's representation of the "Commonwealth" contrary to the Department.

---

[16] Specifically, we granted oral argument limited to the following questions:

> Did the Commonwealth Court err in holding that the Office of Attorney General was bound by the Department of Revenue's interpretation of 72 P.S. § 7401(3)2.(a)(17) (Subparagraph 17) and prohibited from presenting any independent legal argument contrary to the Department's position, even where, as here, the Attorney General determined that the Department's position conflicted with the express language of the statute and the intent of the General Assembly?

(continued…)

At the outset, however, we reiterate that the parties stipulated to the relevant facts, and we recognize that both issues are pure questions of law requiring this Court's interpretation of statutory provisions. Our standard of review, therefore, is *de novo* and our scope of review is plenary. *Greenwood Gaming & Entertainment, Inc. v. Commonwealth*, 263 A.3d 611, 620 (Pa. 2021).

Pennsylvania's rules of statutory construction provide that "[t]he object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921(a). If the language of a statute is "clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." *Id.* However, if the language is not plain, courts attempt to glean legislative intent from consideration of, inter alia, "the occasion and necessity for the statute," "the circumstances under which it was enacted," and "the object to be obtained." *Id.* § 1921(c)(1),(2).

"Another bedrock principle of statutory construction requires that a statute 'be construed, if possible, to give effect to all its provisions,' so that no provision is mere surplusage." *Commonwealth v. Gilmour Mfg. Co.*, 822 A.2d 676, 679 (Pa. 2003) (quoting 1 Pa.C.S. § 1921(a)). Additionally, we attempt to read statutes and parts of statutes in pari materia when they relate to the same persons or things. 1 Pa.C.S. § 1932.

---

Did the Commonwealth Court err in upholding the Department's interpretation of Subparagraph 17 over the express language of the statute and the intent of the General Assembly?

Order, 11/17/2021. Our grant of limited oral argument did not extend to the OAG's issue questioning whether the Uniformity Clause required the continued application of the Benefit-Received Method. Our ultimate resolution of these issues in favor of application of the Benefit-Received Method obviates the need to address the Uniformity Clause issue.

As is relevant to the tax question before this Court involving a statute derived from a uniform act, the General Assembly has indicated that "[s]tatutes uniform with those of other states shall be interpreted and construed to effect their general purpose to make uniform the laws of those states which enact them." *Id.* § 1927. We additionally construe statutes imposing taxes strictly in favor of the taxpayer. *Id.* § 1928(b)(3). With these rules of statutory construction in mind, we turn to the issues presented.

## I.      OAG's representation of the Commonwealth

The first issue before this Court questions whether the Office of the Attorney General can represent the "Commonwealth," separately from the Department, and forward a statutory interpretation that conflicts with the Department's long-standing interpretation.[17] A brief review of the history of the Office of Attorney General is relevant to our consideration of this issue.

### A.      Constitutional and Statutory Provisions Related to Attorney General

The Attorney General became an independent, elected constitutional officer in May 1978 through the adoption of Section 4.1 to Article IV of the Pennsylvania Constitution, governing the Executive Branch.[18] The amendment designated the Attorney General as

---

[17]    This issue presented by the OAG arguably arises from *dicta* in footnote 12 of the Commonwealth Court's opinion. *Synthes USA HQ, Inc.*, 236 A.3d at 1195 n.12. While the Commonwealth Court questioned the "constitutional or statutory authorization" for the OAG to forward a statutory interpretation inconsistent with that presented by the Department, the court, nevertheless, allowed the OAG to present its argument contrary to the Department. Despite the OAG seemingly not being aggrieved as the Commonwealth Court considered the OAG's argument, we nevertheless address the issue as it is central to the Department's asserted jurisdictional challenge to the OAG's authority to appeal the Commonwealth Court's decision to this Court.

[18]  Section 4.1 of Article IV of the Pennsylvania Constitution, as adopted in 1978, provides that an "Attorney General shall be chosen by the qualified electors of the Commonwealth ...; he shall be the chief law officer of the Commonwealth and shall exercise such powers and perform such duties as may be imposed by law." PA. CONST. art. IV, § 4.1.
(continued…)

the "the chief law officer of the Commonwealth" and instructed that the Attorney General "shall exercise such powers and perform such duties as may be imposed by law." PA. CONST. art. IV, § 4.1. Soon after the voters' adoption of Section 4.1, a task force began drafting legislation to impose the requisite powers and duties referenced by the constitutional provision. This document led to the adoption of the Commonwealth Attorneys Act, which instructs that "[t]he Office of Attorney General shall be an independent department[,]" and that "[t]he Attorney General shall exercise such powers and perform such duties as are hereinafter set forth." 71 P.S. § 732-201. Those powers and duties are the subject of the parties' arguments before this Court.

## B. Parties' Arguments

As noted above, the Department claims to challenge this Court's "jurisdiction" over this case. Specifically, it seeks quashal or dismissal asserting that the "OAG lacks standing to bring this 'appeal'" because it is not a "party who is aggrieved by an appealable order." Dep't Brief at 4 (quoting Pa.R.A.P. 501, providing that "any party who is aggrieved by an appealable order ... may appeal therefrom"). It contends that the OAG was neither a party to, nor aggrieved by, the order in this case, which mandated that the Department, rather that the OAG or the "Commonwealth," issue a refund to Synthes upon remand. Indeed, the Department contends that no party was aggrieved by the Commonwealth Court's order given that the Department and Synthes both agreed with the Commonwealth Court's application of Subparagraph 17 and the resulting refund.

The Department additionally asserts that the CAA "does not vest within the Attorney General any power to become the agency itself, only to serve as the agency's

---

Previously, the Attorney General served at the pleasure of the Governor under Sections 1 and 8 of Article IV of the Constitution. PA. CONST. art. IV, § 1 (amended 1967) (including Attorney General as within the Executive Department of the Commonwealth), § 8 (amended 1909) (providing for the nomination of the Attorney General by the Governor and confirmation by the Senate).

lawyer in actions at law or in equity." Dep't Brief at 3 (quoting *Trotmetter v. Pa. Labor Relations Bd.*, 147 A.3d 601, 608 (Pa. Commw. 2016)). Moreover, it contends that the law does not support the OAG's creation of a "standalone and autonomous 'Commonwealth' client" to advocate the OAG's independent statutory interpretations contrary to the Department's prior interpretation. Dep't Brief at 6. Instead, it asserts that the OAG's powers and duties are statutorily dictated by the CAA, such that it is not a "fourth branch" of government, serving as a "check and balance" against the Executive Branch. *Id.* at 12, 19-20 (citing *Commonwealth v. Carsia*, 517 A.2d 956 (Pa. 1986) (limiting the prosecutorial authority of the OAG to those criminal cases identified in Section 205 of the CAA, 71 P.S. § 732-205)).

The Department emphasizes that the Pennsylvania Constitution "vests the Governor with the 'supreme executive power,' and commands the Governor to 'take care that the laws be faithfully executed.'" Dep't Brief at 1 (quoting PA. CONST. art. IV, § 2). It further explains that the Governor exercises those duties through executive branch agencies, such as the Department, which is entrusted by the Legislature with powers and duties relating to the settlement and collection of taxes and, specifically, to determine corporate tax liability, and to issue assessments and refunds. Dep't Brief at 1. Indeed, it sets forth the various provisions of the Tax Reform Code designating the Department, rather than the OAG, as a party or an adjudicator of corporate tax disputes. Dep't Brief at 14 (citing 72 P.S. §§ 9701, 9702(a), 9703, 9703(c), 9704(a),(d.1)(2),(e)).

Turning to the specific provisions of the CAA, the Department reads the OAG's role as limited to representing the Commonwealth in "actions," which it views as not encompassing "appeals," such as the case at bar. Dep't Brief at 22 (citing 71 P.S. § 732-204(c) ("The Attorney General shall represent the Commonwealth and all Commonwealth agencies ... in any action brought by or against the Commonwealth or its agencies[.]"),

23-24).  To support this theory, it contrasts the CAA's definition of "action" as "[a]ny action at law or in equity" with its definition of "matter," which is defined to include "[a]ction, proceeding or appeal."  *Id.* (quoting 71 P.S. § 732-102).  It argues that to read the term "action" to include appeals renders the definition of "matter" superfluous and would require this Court to rewrite the definition of "action" to add the word "appeal."[19]

The Department further rejects the Commonwealth Court dissent's conclusion that the CAA contemplates dual representation based on Section 303's provision for supersession and intervention.  As set forth below, Subsection 303(a) permits the Governor to request in writing that the Attorney General "authorize the General Counsel to supersede the Attorney General and represent the agency" "[w]henever any action is brought by or against any executive branch agency."  71 P.S. § 732-303.  If the Attorney General does not grant the Governor's request, Subsection 303(b) empowers the Governor to "authorize the General Counsel to intervene" in the litigation.  *Id.*  Moreover, "[s]uch intervention shall be a matter of right and when exercised, confer upon the General Counsel the obligation to represent the Governor and his interests as Chief Executive Officer of the Commonwealth and its Executive Department."  *Id.*  The subsection further explains that in these cases "[t]he Attorney General shall at all times continue to represent the Commonwealth."  *Id.*  The Department, however, asserts that this provision does not apply both because it applies only to "actions" rather than appeals and because the Governor did not seek supersession in this case.

Arguing for dismissal of this appeal, the Department contends that allowing the OAG to litigate its argument in this case would "allow any Attorney General, at any time, in any case, involving any issue, between any litigants to intervene and use the

---

[19]  In contrast, the Department observes that Section 204(a) of the CAA authorizes the Attorney General to provide legal advice to the Governor or agency head "concerning any matter or issue" arising from the Governor or agency's official duties.  Dep't Brief at 25 n.13 (quoting 71 P.S. § 732-204(a)).

'Commonwealth' to advocate OAG's legal views as the true party to the action." Dep't Brief at 2.

The OAG responds to the Department's jurisdictional challenge, asserting that this case presents questions regarding "the fundamental natural and role of the Office of Attorney General." OAG Brief at 6. It emphasizes that the Attorney General is a constitutionally created independent entity, elected by the people. It views its role as "wholly unlike that of private counsel and their clients" due to its constitutional and statutory duties as "chief law officer." *Id.* at 27-28 (citing PA. CONST. art. IV, § 4.1). The OAG argues that the grant of authority to the Attorney General was intended to "assure independent legal review of the implementation of the statutory policies of the Commonwealth" and to provide "a necessary check and balance to the Executive Branch." OAG Brief at 22-23 (quoting the September 1978 final report of the Joint State Government Commission drafting the CAA, entitled "Office of Elected Attorney General: Final Report" at 5).

The OAG explains that, in contrast to the General Counsel, which is tasked with providing legal advice and representation to the Governor, the Attorney General represents the Commonwealth under the CAA. OAG Reply Brief at 4 (comparing 71 P.S. § 732-201(a) (providing powers and duties of Attorney General) with 71 P.S. § 732-301(setting forth powers and duties of General Counsel)). Given these constitutional and statutory roles, the OAG argues that it is not merely a "mouthpiece" for the Governor and the agencies, but rather provides independent legal service to the Commonwealth as a whole. *Id.* at 4, 6.

The OAG highlights Section 303 of the CAA, providing the supersession and intervention procedures, which the OAG views as anticipating and addressing conflicts arising between an independent OAG and the Executive Branch regarding the

representation of agencies. Rather than binding the Attorney General to the agency's interpretation in the event of a conflict, the OAG asserts that Section 303 provides for "dual representation" as it allows for the Governor to authorize the General Counsel to intervene "to represent the Governor and his interests as Chief Executive Officer of the Commonwealth and its Executive Department," while "the Attorney General shall at all times continue to represent the Commonwealth." 71 P.S. § 732-303(b). Like the Commonwealth Court dissent, the OAG emphasizes that this Court approved of such dual representation in *Fidelity Bank*, 444 A.2d at 1161. OAG Brief at 25.

The OAG also discredits the Department's attempt to limit the OAG's authority "to represent the Commonwealth and all Commonwealth agencies ... in any action brought by or against the Commonwealth or its agencies" under Section 204(c) and the application of Section 303 of the CAA based upon the use of the term "action," which the Department views as not extending to appeals. The OAG responds that the term "action" is defined broadly as "any action in law or equity." OAG Reply Brief at 12 (quoting 71 P.S. § 732-102). The OAG also asserts that it would be absurd for the statute to authorize the OAG to represent an agency at trial but not on appeal, leaving the agency potentially without representation on appeal given that the General Counsel has limited authority to act. *Id.* at 15.

The OAG further highlights the longstanding practice of the OAG representing agencies through the appellate process, including representing the Department on tax appeals for forty years. In further justification of its position that it is authorized to represent the Commonwealth, the OAG points to Pennsylvania Rule of Appellate Procedure 1571(c)(4), which requires that appeals from the Board of Finance and Revenue "shall name the 'Commonwealth of Pennsylvania' as respondent. Pa.R.A.P. 1571(c)(4)." OAG Brief at 26. Indeed, the Rules of Appellate Procedure also require the

taxpayer to serve process on the OAG of any petition for review of a Board of Finance and Revenue order pursuant to Pa.R.A.P. 1514(c).[20] It emphasizes that the Legislature has not acted to correct this common representation by the OAG, including following this Court's decision in *Fidelity Bank.*

The OAG asserts that the Commonwealth's involvement in tax appeals is proper, as tax revenues are not assets of the Department but of the Commonwealth. OAG Brief at 26. Indeed, it contends that the "Commonwealth" was clearly aggrieved by the remand order in this case as it had a "substantial, direct, and immediate interest" in the potential refund of $2 million of taxes to Synthes. OAG Reply Brief at 9-10. [21]

### C.    Analysis

We acknowledge the Commonwealth Court's discomfort with what appears, at first glance, to be attorneys advocating arguments that directly conflict with their client's stated position; indeed, such a dynamic is the opposite of the zealous advocacy due clients and calls for consideration of the Pennsylvania Rules of Professional Conduct. Nevertheless, upon closer review, we observe that the Attorney General is in fact representing the Commonwealth while the agency retains its own counsel. This arrangement is permissible in the case at bar because it conforms to the CAA. While the Attorney General regularly represents the Department, it is not merely the Department's law firm. Instead, the Pennsylvania Constitution designates the Attorney General as the "chief law

---

[20]  The Fiscal Code, 72 P.S. §§ 1-1805, in addressing the powers and duties of the Board of Finance and Revenue, identifies who may appeal from a decision of the Board of Finance and Revenue on a petition for refund. Section 503, as with Rule 1571(c)(4), names the Commonwealth as a (potential) party in appeals of petitions for refund. 72 P.S. § 503(e). In Section 503(i), a provision whose substantive content is otherwise irrelevant to the present dispute, the General Assembly addressed the **Department**'s management of refunds, thus supporting the reality that the Commonwealth (addressed in Section 503(e)) is a party separate and apart from the Department. 72 P.S. § 503(i).

[21]  Synthes confines its appellee brief to the tax issue set forth below.

officer" for the Commonwealth as a whole, accountable directly to the Pennsylvania voters, and independent of the Governor and the Commonwealth agencies. PA. CONST. art. IV, § 4.1.

The CAA provides both for the Attorney General's representation of the Executive Branch and also for the Attorney General's independence from the Executive Branch. Multiple sections of the CAA contemplate divergences in the legal determinations of the Attorney General and the Governor or the Commonwealth agencies. For example, Section 204(a) allows the Governor or the agencies to seek the legal advice of the Attorney General. If the Governor or agency disagree with the Attorney General's legal conclusion, they are bound by that conclusion until they seek and receive a declaratory judgment to the contrary. [22] 71 P.S. § 732-204(a). Subsequently, in Section 204(c), the CAA provides for the Attorney General's representation of the Executive Branch. Section 204(c) provides that "the Attorney General shall represent the Commonwealth and all Commonwealth agencies ... in any action brought by or against the Commonwealth or its

---

[22] In relevant part, Subsection 204(a), entitled "Legal advice" provides as follows:

> (1) Upon the request of the Governor or the head of any Commonwealth agency, the Attorney General shall furnish legal advice concerning any matter or issue arising in connection with the exercise of the official powers or the performance of the official duties of the Governor or agency... . [T]he advice when received shall be followed... .

> (2) If the Governor or the head of any Commonwealth agency disagrees with the legal advice rendered by the Attorney General, the Governor or the head of the Commonwealth agency may seek a declaratory judgment in the Commonwealth Court ... . The legal advice of the Attorney General shall be binding until the Commonwealth Court issues a final order on the petition requesting the declaratory judgment.

71 P.S. § 732-204(a)(1)-(2).

agencies, and may intervene in any other action… .” 71 P.S. § 732-204(c).[23] This section unambiguously gives the OAG the authority to represent both the Commonwealth and its agencies.

As applicable to the case at bar, Section 303 provides for the Attorney General's representation of the Commonwealth separate from the agency. This section allows the Governor or another executive branch official to request that the Attorney General step aside and allow the Office of General Counsel to represent the agency. 71 P.S. § 732-303(a).[24] In the event that the Attorney General does not grant the request, the Governor may authorize the General Counsel to intervene in the litigation which intervention shall be a matter of right. *Id.* § 303(b). Upon intervention, the General Counsel has the obligation to represent the Governor and the Executive Department, i.e., the agency, and the Attorney General shall at all times continue to represent the Commonwealth. *Id.*[25]

---

[23] Section 204(c) provides in relevant part,

> The Attorney General shall represent the Commonwealth and all Commonwealth agencies …. in any action brought by or against the Commonwealth or its agencies, and may intervene in any other action …. [.] The Attorney General may, upon determining that it is more efficient or otherwise is in the best interest of the Commonwealth, authorize the General Counsel or the counsel for an independent agency to initiate, conduct or defend any particular litigation or category of litigation in his stead … .

71 P.S. § 732-204(c).

[24] Section 403 of the CAA provides for the same process with regard to independent agencies. 71 P.S. § 732-403.

[25] § 723-303. Supersession and intervention

> (a) Representation of agency by General Counsel. -- Whenever any action is brought by or against any executive branch agency, the Governor or other executive branch official, the Governor may request in writing, setting forth his

(continued…)

This statutory authorization is consistent with the constitutional empowerment of the Attorney General as the independently elected "chief law officer." PA. CONST. art. IV, § 4.1.

Section 303 addresses, inter alia, what happens when there is a conflict between the interests of the Commonwealth as declared by the Attorney General and the interests of the agency as determined by the Executive Branch. Once the agency intervenes as of right, the agency is represented by the General Counsel's Office and the Commonwealth continues to be represented by the OAG. The OAG's articulation of the status of its representation conforms to Section 303(b): "General Counsel represents the agency while '[t]he Attorney General … at all times **continue[s]** to represent the Commonwealth.'" OAG Brief at 24 (citing 71 P.S. § 732-303(b)). The OAG elaborates:

> The Attorney General works closely with the Office of General Counsel and agency official when defending lawsuits. But sometimes reasonable minds can disagree. When that occurs, the Attorney General – as chief law officer of the Commonwealth – prevails on what legal strategies are in the best interest of the Commonwealth. Even when an agency

> reasons, the Attorney General to authorize the General Counsel to supersede the Attorney General and represent the agency, the Governor or other executive branch official.
>
> (b) Intervention by General Counsel. -- If the Attorney General does not grant the request, the Governor may authorize the General Counsel to intervene in the litigation. Such intervention shall be a matter of right and when exercised, confer upon the General Counsel the obligation to represent the Governor and his interests as Chief Executive Officer of the Commonwealth and its Executive Department. The Attorney General shall at all times continue to represent the Commonwealth.

71 P.S. § 732-303(a). Section 403 provides functionally identical language for independent agencies, empowering the head of an independent agency to request supersession and intervention by the agency's counsel in "action[s] brought by or against any independent agency or independent agency official." 71 P.S. § 732-403.

> intervenes under Section 303 of the [CAA], the Attorney General always "continues" to represent the Commonwealth.

OAG Brief at 29. Likewise, the Department recognizes that the OAG claims to represent the Commonwealth, not the agency. *See, e.g.*, Dep't Brief at 12 (disputing the OAG's authority to "create" a client; it "cannot create a 'Commonwealth' client to express its views of the law").

The OAG also points to *Fidelity Bank*, a case involving the Turnpike Commission and the Attorney General, as supporting its position. The language of Section 403 at issue in *Fidelity Bank* is almost identical to that of Section 303. It provides the mechanism for the head of an independent agency to request supersession in the representation of the agency or its official. 71 P.S. § 732-403(a). Like in Section 303(b), if the Attorney General does not grant the supersession request, the independent agency head may authorize agency counsel to intervene in the litigation. Intervention is a matter of right and it confers "upon the agency counsel the obligation to represent the agency[,]" while the Attorney General at all times continues to represent "the Commonwealth." *Id*. § 403(b).

However, contrary to the OAG's argument, *Fidelity Bank* does not support the position it takes in this case. The circumstances of the representation in *Fidelity Bank* raised a unique question not presented here. Namely, the Court considered the propriety of **dual** representation, that is, one client (the Turnpike Commission) represented by two attorneys (agency counsel and the Attorney General). The *Fidelity Bank* Court first rejected the Turnpike Commission's position that upon its intervention, the Attorney General was to be ousted from the litigation. *Fidelity Bank*, 444 A.2d at 1160-61. We reaffirm the *Fidelity Bank* Court's core point that, when an independent agency exercises its right to intervene under Section 403(b), the operation of that mechanism does not oust

the Attorney General from the litigation because the Attorney General "shall 'continue to represent the Commonwealth[.]'" *Id.*

However, the *Fidelity Bank* Court further concluded that after supersession, the OAG continued to represent the Turnpike Commission. The Court stated:

> Section 403 of the [CAA], while permitting the Attorney General to delegate the duty to agency counsel [to represent the Turnpike Commission] upon request, in no way affects the continued right of the Attorney General to represent the agency if he so chooses. The concluding language of [Section] 403(b) makes this clear by providing that the Attorney General shall "continue to represent the Commonwealth" when agency counsel intervenes. The proceeding sentence, which states that the agency counsel shall be obligated to represent the agency when the right of intervention is exercised, speaks only to the duty of agency counsel as intervenor, not the position of the Attorney General in the litigation. Thus it is apparent that Section 403(b) does not compel the ouster of the Attorney General when agency counsel intervenes. Rather, the [CAA] contemplates the possibility of dual representation where the Attorney General and the members of an agency disagree as to an agency's interests or where, as here, the members of an agency are themselves unable to agree upon the agency's interests and the Attorney General disagrees with the agency's chairman. Accordingly, we reject the claim of Commission counsel that his intervention bars the Attorney General from representing the Commission in this litigation.

*Fidelity Bank*, 444 A.2d at 1161 (internal footnote omitted). The *Fidelity Bank* Court treats the language providing that the Attorney General shall continue to represent the Commonwealth as if it states that the Attorney General continues to represent the agency. Given the clear language of Section 403(b), this is a questionable universal proposition,[26]

---

[26] *Fidelity Bank* presents a unique set of facts. The question of the appropriate legal representative of the Turnpike Commission arose because the Turnpike Commission did not have a sufficient number of commissioners to constitute a quorum and was thus (continued…)

and one with which we disagree.  Moreover, what the Attorney General seeks in this case – representation of the Commonwealth – is inapposite to the holding of *Fidelity Bank* but consistent with Section 303(b).

We additionally reject the Department's attempt to read the Attorney General's representation of agencies in Section 204(c) and the reach of Sections 303 and 403 as applying only to "actions" and not encompassing the Attorney General's representation of agencies on "appeal."  The Department observes that Section 204(c) requires that the "Attorney General shall represent [agencies] in any action brought by or against the Commonwealth or its agencies" and does not use the broader term "matter" or the more explicit term "appeal."  71 P.S. § 732-204(c).[27]  If the General Assembly had intended the use of the term "action" to limit the Attorney General's representation to the pre-appeal stage, we would expect the Legislature to provide expressly for a transition of representation, rather than leaving agencies unrepresented at the critical appellate stage.  Instead, Section 204(c) appears to create a duty for the Attorney General to begin its

---

unable to transact any business.  Under such circumstances, it is doubtful that the Commission has the power to formulate a decision as to whether the OAG or General Counsel should represent it.  Under these circumstances, it is conceivable that the OAG and General Counsel could represent the Commission because of the lack of a foundation for the Commission to opt for representation by General Counsel.

[27]  The CAA defines "action" somewhat circularly as "[a]ny action at law or in equity," while "matter" applies more expansively to include "[a]ction, proceeding or appeal," and appeal and proceedings are undefined.  71 P.S. § 732-102.  Despite the circularity of the CAA's definition of "action," the rules of statutory construction assist our interpretation by defining "action" as "[a]ny suit or proceeding in any court of this Commonwealth."  1 Pa.C.S. § 1991 (providing definitions applicable to "any statute finally enacted on or after September 1, 1937").  Thus, when these definitions are incorporated, an "action" under the CAA is "[any suit or proceeding in any court of this Commonwealth] at law or equity." *Id.*; 71 P.S. § 732-102.  While "proceeding" is defined in the Judicial Code to exclude actions and appeals, that definition is not included in the CAA or the rules of statutory construction.  42 Pa.C.S. § 102 (defining "Proceeding" as including "every declaration, petition or other application which may be made to a court under law or usage or under special statutory authority, but the term does not include an action or an appeal").

representation of agencies when an "action" is brought, without suggestion of an end point of that representation.

This reading is further supported by Sections 303 and 403, which also apply "[w]henever any action is brought by or against" the relevant Commonwealth entity. 71 P.S. §§ 732-303(a); 732-403(a). Thus, the "action" triggers the Governor or agency head's ability to ask the Attorney General to step aside in representing the agency. The filing of the action, however, is merely the starting point as subsection (b) contemplates the intervention of the General Counsel or agency counsel in the "litigation"[28] and providing that the "Attorney General shall at all times continue to represent the Commonwealth." *Id.* §§ 732-303(b); 732-403(b). The General Assembly's use of the phrase "at all times" in the absence of an express exclusion of the appellate stage undermines the Department's attempt to limit the reach of these provisions.

Moreover, the Department's attempt to limit the Attorney General's representation and the supersession and intervention procedures to "actions" rather than "appeals" conflicts with the last four decades of practice of the OAG representing agencies, including the Department on appeal. Indeed, it conflicts with other statutory provisions addressing tax appeals and the appellate rule requiring that the OAG be served and named when an appeal is taken from a decision of the Board of Finance and Revenue.[29] Pa.R.A.P. 1514(c) ("A copy of the petition for review shall be served by the petitioner … on both the government unit that made the determination … and the Attorney General of

---

[28] The term "litigation" is not defined in the CAA or the rules of statutory construction.

[29] For example, the Taxpayer Bill of Rights contemplates the "Commonwealth" being the party capable of appealing a decision of the Board of Finance and Revenue, to which the Department would be bound: "Where the Board of Finance and Revenue has issued a decision or an order in favor of a taxpayer and the Commonwealth has not appealed the decision or order, the department may not make an assessment against the taxpayer that raises an identical or substantially identical issue." 72 P.S. § 3310-210(a).

Pennsylvania."). These provisions are consistent with the OAG's representation continuing into the appeal stage.

We therefore preliminarily conclude that the Attorney General, as an independently elected, constitutional officer, is authorized by the CAA to represent the Commonwealth separately from the Department on appeals from the Commonwealth Court generally. We have little hesitation in concluding that the Attorney General can do so in this case. This Court's jurisdiction in the case at bar is clear as the appeal arises from a "final order of the Commonwealth Court entered in [an] appeal from a decision of the Board of Finance and Revenue." 42 Pa.C.S. § 723(b). Moreover, we reject the Department's contention that the Commonwealth, as represented by the Attorney General, does not have standing, as the Commonwealth is indisputably aggrieved by an order remanding the case for the Board of Finance and Revenue to issue a tax refund.

However, as to the operation of Section 303, we cannot overlook that the Attorney General and the attorneys in the OAG are attorneys who are bound by the Pennsylvania Rules of Professional Conduct promulgated by this Court.[30] Section 204(c) unambiguously gives the OAG the authority to represent both the Commonwealth and its agencies thus establishing a concurrent representation as contemplated by the Rules of Professional Conduct. Critically and fundamentally, pursuant to Rule 1.7 (Conflict of Interest: Current Clients),[31] the Attorney General and the attorneys employed by the OAG

---

[30] It is pertinent to note that pursuant to Article IV, Section 5 of our Constitution, one of the qualifications for the Office of the Attorney General is membership of the bar of the Supreme Court of Pennsylvania. PA. CONST. art. IV, § 5.

[31] **Rule 1.7. Conflict of Interest: Current Clients**

> (a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(continued…)

shall not represent a client (the Department) if the representation involves a conflict of interest with a concurrent client (the Commonwealth). Such conflicts arise when the OAG, on behalf of the Commonwealth, declares interests at odds with those of the Department. Rule 1.11 (Special Conflicts of Interest for Former and Current Government Officers and Employees) makes clear that the OAG attorneys and the Attorney General are subject to Rule 1.7 "[e]xcept as law may otherwise expressly permit." Pa.R.P.C. 1.11(d).[32] Section 303 makes clear that the CAA does not "otherwise permit" the OAG to

---

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent.

Pa.R.P.C. 1.7.

[32] Rule 1.11 Special Conflicts of Interest for Former and Current Government Officers and Employees:

* * *

(continued…)

engage in conflicted concurrent representation of the agency on the one hand and the Commonwealth on the other. Instead, 303(b) clearly and unambiguously provides for the separate representation of the agency by the Office of the General Counsel in such circumstances while the OAG's other client, the Commonwealth, continues to be represented by the OAG.

Having established that the circumstances here, consistent with Section 303(b), involve two attorneys representing two clients, we are still left with questions about the OAG's involvement in representation advancing a position directly contrary to that of its former client. While Section 303 places the initiation of the formal supersession process in the hands of the Executive Branch, the Rules of Professional Conduct place the responsibility on the attorney to inform the client of any circumstance to which the client's informed consent is required.[33] Consequently, the OAG was ethically bound to advise the Department of its conflicting interpretation of the tax provision at issue in this case. Under Rule of Professional Conduct 1.2,[34] a lawyer shall abide by a client's decision

(d) Except as law may otherwise expressly permit, a lawyer currently serving as a public officer or employee:

      (1) is subject to Rules 1.7 and 1.9; …

Pa.R.P.C. 1.11(d)(1).

[33] Rule 1.4. Communication

      (a) A lawyer shall:

(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules[… .]

Pa.R.P.C. 1.4(a)(1).

[34] Rule 1.2. Scope of Representation and Allocation of Authority Between Client and Lawyer

(continued…)

concerning the objectives of representation and consult with the client about how the objectives will be pursued. Here, when the Attorney General made the decision on behalf of his current client, the Commonwealth, to pursue an objective antithetical to the position of the Department, the Attorney General was required to advise the Department. So advised, the Department, through the Governor, would then request the Attorney General to allow supersession and absent consent, proceed to intervention as of right through the General Counsel.[35]

The OAG cites the Preamble and Scope [17] of the Rules of Professional Conduct,[36] asserting that it establishes that attorneys for the OAG are "not akin to private

---

(a) Subject to paragraphs (c) and (d), a lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to settle a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.

Pa.R.P.C. 1.2(a).

[35] Under these circumstances, we question why the Attorney General would force compliance with Section 303 since the Attorney General clearly cannot advocate for both the position of the Commonwealth and the contrary position of the Department. Likewise, it is hard to fathom how the Attorney General could refuse a request for supersession under these circumstances. Section 303(a) permits the Attorney General to refuse a request by the Governor to authorize the General Counsel to supersede the Attorney General and represent the agency, the Governor or other Executive Branch official. There are undoubtedly many strategic or political reasons why the Governor may prefer representation by the General Counsel that do not rise to the level of a conflict of interest. However, where the request for representation by the General Counsel is based on a conflict between the interest of the Commonwealth, as declared by the Attorney General, and the interest of the Executive Branch entity, Rule 1.7 prohibits the Attorney General from continuing to represent the agency.

[36] According to the Preamble and Scope of the Rules of Professional Conduct,

> [17] Under various legal provisions, including constitutional, statutory and common law, the responsibilities of government

(continued…)

counsel." OAG Brief at 27. Indeed, the Rules address their own scope in relation to government attorneys. Where the law so provides, attorneys of the OAG may be authorized to represent different agencies, and attorneys of the OAG may enjoy special authority to decide upon settlements and appeals. Moreover, the Rules do not purport to supersede any such legal authority. Pa.R.P.C. Preamble & Scope [17].

However, this section of the Rules of Professional Conduct does not itself define the professional responsibilities of the attorneys for the OAG. It merely recognizes that other sources of law may do so. Significantly, the OAG does not cite to any legal authority permitting it to operate under a concurrent conflict of interest in violation of the applicable rules. OAG Brief at 27. Nor does it recognize the applicability of Rule 1.7 to it pursuant to Rule 1.11(d). The Scope [17] of the Rules of Professional Conduct does not alter the duty of the attorneys for the OAG who must adhere to Rule 1.7. Critically, Section 303 provides the mechanism for resolving the conflict in a manner that is more lenient than the resolution process applicable to private attorneys. For example, a private attorney would have to consider whether she could continue to represent either client when a conflict arises because of the possibility that client confidences would be breached by

_____

> lawyers may include authority concerning legal matters that ordinarily reposes in the client in private client-lawyer relationships. For example, a lawyer for a government agency may have authority on behalf of the government to decide upon settlement or whether to appeal from an adverse judgment. Such authority in various respects is generally vested in the attorney general and the state's attorney in state government, and their federal counterparts, and the same may be true of other government law officers. Also, lawyers under the supervision of these officers may be authorized to represent several government agencies in intragovernmental legal controversies in circumstances where a private lawyer could not represent multiple private clients. These Rules do not abrogate any such authority.

Pa.R.P.C. Preamble & Scope [17].

continued representation.  *See* Pa.R.P.C. 1.7 cmt. 4.  Section 303(b), however, removes this consideration as an impediment because it provides that the Attorney General shall continue to represent the Commonwealth.

The concurring opinion chastises us for using the Rules of Professional Conduct "to fill in purported statutory gaps in the CAA."  Concurring Op. at 2.  That is not our focus or intent.  We note again that when the citizens of Pennsylvania amended our charter to create the Office of Attorney General, they mandated that the holder of that office must be a member of the bar of the Supreme Court of Pennsylvania.  *See* n.30 citing PA. CONST. art. IV, § 5.  Membership in the bar of this Court inherently carries with it the obligation of admitted attorneys to consult our promulgated Rules of Professional Conduct to guide their practice.  The Rules provide a framework for the ethical practice of law. Pa.R.P.C. Preamble & Scope [15] (… "The Rules do not, however, exhaust the moral and ethical considerations that should inform a lawyer, for no worthwhile human activity can be completely defined by legal rules.  The Rules simply provide a framework for the ethical practice of law.").  To suggest that the citizens of our Commonwealth did not intend for our Attorney General to be guided by this ethical framework when requiring membership in the bar of this Court guts the meaning of being a member of our bar.

The parties to this appeal recognize the centrality of the Rules of Professional Conduct to this dispute.  Both the OAG and the agency sought support for their respective arguments in our Rules of Professional Conduct.  *See*, OAG's Brief at 27-28 (arguing that the Rules of Professional Conduct make the AG and his relationship to agencies "wholly unlike that of private counsel and their clients[]"); Department's Brief at 30 n.18 (disputing the OAG's interpretation of the Rules of Professional Conduct and citing to various rules in the Rules of Professional Conduct as supporting its view).  Moreover, as discussed, the structure of the CAA reflects situations addressed in the Rules of Professional

Conduct including concurrent representation by the Attorney General in Section 204(c) and the resolution of conflicts of interest that arise in the representation of concurrent clients in Section 303.

We granted oral argument in this direct appeal by the OAG to address, inter alia, the OAG's authority to take a legal position which conflicts with the legal position of the Department. Order, 11/17/2021.[37] While we have concluded that the CAA provides the mechanism for the OAG to take a position on behalf of the Commonwealth contrary to that of an executive branch agency, it is important to frame the conclusion with an eye to the interplay with the Rules of Professional Conduct.[38]

We take no position on whether the OAG gave notice or adequate notice to the agency about its divergent view of the tax question involved in this appeal. *See* n.10 supra. However, the Commonwealth Court's reaction to the uncomfortable confrontation between the OAG and the agency (noting "with dismay the Attorney General's assertion in this case of a legal position directly adverse to that of its client, the Department[,]" *Synthes USA HQ, Inc.*, 236 A.3d at 1195 n. 12) stems from its understanding of the

---

[37] Our order stated in pertinent part:

> a. Did the Commonwealth Court err in holding that the Office of Attorney General was bound by the Department of Revenue's interpretation of 72 P.S. § 7401(3)2.(a)(17) (Subparagraph 17) and prohibited from presenting any independent legal argument contrary to the Department's position, even where, as here, the Attorney General determined that the Department's position conflicted with the express language of the statute and the intent of the General Assembly?

[38] We agree with the Concurrence that the Rules of Professional Conduct do not create substantive legal rights in any party. Concurring Op. at 2-3. Thus, for example, the agency could not, and did not, attempt to prevail on its claim that the OAG could not assert a legal position contrary to its view of the resolution of the tax question because the OAG had a conflict of interest under Rule 1.7. The Rules are not designed to provide relief to a party based on the purported breach of a Rule of Professional Conduct by his or an opposing party's attorney.

organic role that the Rules play in all of an attorney's professional undertakings. It reasoned that the OAG should have advised the Department that it would be taking a position contrary to its own so that the Department could otherwise protect its interest. *Id.* Of course, this is the ethical guidance provided in Rule 1.2. The Concurrence's view that the application of the Rules of Professional Conduct is outside the scope of the issues presented in this direct appeal ignores the intermediate appellate court's recognition of the necessity for lawyers to protect their client's interests and to conduct themselves free of conflicts of interest and this Court's constitutional authority to oversee the conduct of members of our bar.

Within the context of the CAA, the Rules of Professional Conduct provide clear ethical guidance to the OAG, as counsel with two clients with conflicting interests. It is the duty of the OAG to advise the agency of the conflict — only then does the agency have the statutory obligation to trigger supersession under Section 303 by requesting, through the Governor, for the OAG to allow General Counsel to take over the case on its behalf and then, if not granted, to exercise its right of automatic intervention. By virtue of Section 303(b), the OAG at all times, continues to represent the Commonwealth. While the ethical obligation to a concurrent client gives rise to the OAG's notice of the conflict to the agency, independent of this ethical obligation, it is hard to imagine how Section 303 can otherwise operate when there is a conflict of interest. Automatic intervention cannot occur unless the Executive Branch department can first make a request for supersession which requires advanced knowledge of the conflict which requires notice by the OAG of the conflict.[39] Although the statutory process was not followed in this case, a result that conformed to the statute was achieved as the Commonwealth Court allowed the agency's intervention, and the OAG continued to represent the Commonwealth.

---

[39] Notice of a conflict by the Attorney General also avoids delays in the judicial process and reduces confusion for opposing, non-Commonwealth parties.

## II. Sourcing Sales of Services under Subparagraph 17

## A. Historical Context and Statutory Language

The parties next dispute the method for sourcing sales of services between Pennsylvania and other states in order to calculate Synthes' 2011 income taxable in Pennsylvania. The relevant provisions of Pennsylvania's Tax Reform Code derive from the Uniform Division of Income for Tax Purposes Act ("UDITPA") which was drafted in 1957 by the National Conference of Commissioners on Uniform State Laws. As the name suggests, the UDITPA was created to provide a uniform system of dividing a corporation's net income amongst the states in which it conducts business.[40] The goal of the UDITPA was to "simplify the task of tax collection and reporting and to ensure that 100 percent of a multistate firm's income - neither more nor less - is taxable by the states." Walter Hellerstein, *Construing the Uniform Division of Income for Tax Purposes Act: Reflections on the Illinois Supreme Court's Reading of the "Throwback" Rule*, 45 U. Chi. L. Rev. 768, 775 (1978).[41]

---

[40] The text of the UDITPA as approved by the American Bar Association in July 1957, with amended comments dated 1966, is available at Nat'l Conference of Comm'rs of Uniform State Laws, Division of Income for Tax Purposes https://www.uniformlaws.org/viewdocument/final-act-54?CommunityKey=f2ef73d2-2e5b-488e-a525-51be29fbee47&tab=librarydocuments (last accessed Nov. 23, 2022) ("*UDITPA with 1966 Comments*").

[41] Apportionment of income is necessary as the United States Supreme Court has held "[u]nder both the Due Process and the Commerce Clauses" that a state's corporate income tax cannot "tax value earned outside its borders." *Container Corp. of America v. Franchise Tax Bd.*, 463 U.S. 159, 164 (1983). The Court, however, has observed that "[a]llocating income among various taxing jurisdictions bears some resemblance ... to slicing a shadow." *Id.* at 192. Thus, the High Court has granted states "wide latitude in the selection of apportionment formulas," *Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 274 (1978), while setting forth requirements that are not at issue in the current appeal. *See, e.g., Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279 (1977) (setting forth factors necessary to satisfy the federal Commerce Clauses).

The UDITPA was later incorporated as Article IV of the Multistate Tax Compact, ("MTC") as drafted by the Multistate Tax Commission ("the Commission") in 1966, apparently as an attempt by states to prevent federally mandated uniform apportionment to address the myriad apportionment systems then in place across the country. [42] John A. Swain, *Reforming the State Corporate Income Tax: A Market State Approach to the Sourcing of Service Receipts*, 83 Tul. L. Rev. 285, 295 (2008). As of 2015, two-thirds of the states with a corporate net income tax "adhere closely to" the UDITPA and the remaining states "generally take it into account in their income attribution determinations." *See About the Multistate Tax Compact*. While Pennsylvania adopted neither the MTC nor the UDITPA in full, the General Assembly has incorporated verbatim much of the language and structure of the UDITPA into the Tax Reform Code.[43]

At base, rather than attempting the near-impossible task of determining the actual income earned by a multistate corporation in each state, the UDITPA attempts to approximate the income attributable to an individual state through the application of a three-factor formula which considers the location of the corporation's property, payroll, and sales. *See* Swain, 83 Tul. L. Rev. at 288. As they have been described, "[t]he property and payroll factors are intended to give weight to the states in which production occurs ('origin' states), while the sales factor is intended to give weight to the states that

---

[42] Information concerning the MTC and the incorporation of the UDITPA can be found at MTC, About the Multistate Tax Compact and Suggested Enabling Act, https://www.mtc.gov/getattachment/The-Commission/Multistate-Tax-Compact/About-the-Compact-and-Suggested-Enabling-Act.pdf.aspx (last accessed Nov. 23, 2022) (hereinafter "*About the Multistate Tax Compact*").

[43] For purposes of this opinion, the numerations of the relevant provisions in the UDITPA and the Tax Reform Code are effectively the same, but for the Pennsylvania provision's location in the larger Section 7401. Thus, we refer to the UDITPA's provisions as "Sections" and Pennsylvania provisions as "Subparagraphs."

provide the market for the taxpayer's products ('market' states or 'destination' states)." *Id.*

Each factor (property, payroll, and sales) is a ratio of the corporation's quantity of that factor in the taxing state as compared to that factor in all states. For example, as relevant to the case at bar, Pennsylvania's Subparagraph 15 provides that "[t]he sales factor is a fraction, the numerator of which is the total sales of the taxpayer in this State during the tax period, and the denominator of which is the total sales of the taxpayer everywhere during the tax period." 72 P.S. § 7401(3)2.(a)(15).

As set forth in the UDITPA and as originally adopted in Pennsylvania, the property, payroll, and sales factors were evenly weighted. Many states, however, have amended their statutes in the intervening years to increase the weight of the sales factor. Swain, 83 Tul. L. Rev. at 289 n.17. This movement has been explained as an attempt to increase the tax competitiveness of the jurisdiction by reducing the tax cost of investing in local property and employees "while increasing the tax cost of exploiting the state's marketplace" through sales. *Id.* at 289-90, 356. Pennsylvania has repeatedly increased the relative weight of the sales factor and, ultimately, eliminated the property and payroll factors for all tax years beginning in 2013. As relevant to Synthes' 2011 taxes, Pennsylvania's Tax Reform Code provided as follows:

> For taxable years beginning after December 31, 2009, all business income shall be apportioned to this State by multiplying the income by a fraction, the numerator of which is the sum of five times the property factor, five times the payroll factor and ninety times the sales factor and the denominator of which is one hundred.

72 P.S. § 7401(3)2.(a)(9)(A)(iv).

As noted, the sales factor requires calculation of the "total sales of the taxpayer in this State[.]" 72 P.S. § 7401(3)2.(a)(15). As originally drafted, total sales is comprised of

the UDITPA's Section 16's "sales of tangible personal property" and Section 17's sales "other than sales of tangible personal property." As adopted in Pennsylvania, Subparagraph 16 provides, "Sales of tangible personal property are in this State if the property is delivered or shipped to a purchaser, within this State regardless of the f. o. b. point or other conditions of the sale."[44] 72 P.S. § 7401(3)2.(a)(16).

As originally set forth in the UDITPA and as incorporated in Pennsylvania, Subparagraph 17 provided as follows:

> (17) Sales, other than sales of tangible personal property, are in this State if:
>
> (A) The income-producing activity is performed in this State; or
>
> (B) The income-producing activity is performed both in and outside this State and a greater proportion of the income-producing activity is performed in this State than in any other state, based on costs of performance.

72 P.S. § 7401(3)2.(a)(17). As noted, Subparagraph 17 is at the heart of the statutory challenge in the case at bar, as we are asked to determine how to allocate Synthes' sales of services, which are sales "other than sales of tangible personal property." *Id.*

Commentators and courts have "routinely criticized UDITPA section 17 for its ambiguity," observing that it has created "confusion for taxpayers and taxing authorities alike." *AT & T Corp. v. Department of Revenue*, 358 P.3d 973, 982 (Or. 2015) (quoting *Swain*, 83 Tul. L. Rev. at 306). Many have read Section 17, as does the OAG, as allocating sales "other than sales of tangible personal property," such as services, to the

---

[44] This Court previously applied Subparagraph 16 and explained that "F.O.B. is an abbreviation for 'free on board.' The significance of the designation is that it sets the point at which title for goods passes to the purchaser." *Gilmour*, 822 A.2d at 678 n.2. While Pennsylvania did not adopt the UDITPA's Section 16 in full, the omissions are not relevant to the issues in the case at bar.

origin state (often the taxpayer's location). In turn, however, many have criticized this reading as placing Section 17 at odds with Section 16's allocation of sales of tangible personal property to where the property is delivered, or its destination (often the customer's location).

Moreover, some have argued that allocation of Section 17's sales of services to the taxpayer rather than the customer's location seems "contrary to the very purpose of the sales factor, which is to reflect the contribution of the market state." *Swain*, 83 Tul. L. Rev. at 288. Similarly, addressing the sales factor generally rather than Section 17 specifically, this Court has opined that "the numerator of the sales factor represents the contribution of Pennsylvania consumers and purchasers to the entity's sales, while the denominator represents the contribution of all consumers and purchasers." *Gilmour*, 822 A.2d at 683 (quoting *Gilmour Mfg. Co. v. Commonwealth*, 750 A.2d 948, 953 (Pa. Commw. 2000)).

In that case, this Court explained that use of the "destination" sourcing furthered the purpose of the corporate net income tax generally, which it viewed as being "designed to measure the amount of commercial activity that an entity engages in during a given year and tax it accordingly."[45] *Id.* Moreover, allocating sales of services based upon where the employee is located arguably "double counts" the taxpayer's physical location in apportioning income between states, as the physical location is accounted for through

---

[45] In *Gilmour*, this Court analyzed the sales factor of Subparagraph 15 as it applied to tangible personal property, pursuant to Subparagraph 16, specifically, the allocation of sales of lawn and garden products manufactured by Gilmour in Pennsylvania. The parties questioned whether the allocation of these sales differed based upon whether Gilmour shipped the products to a customer out of state or whether that out-of-state customer picked up the products at Gilmour's dock, as so-called "dock sales." The Court, relying upon rules of grammar as well as the interpretation of sister courts, deemed sales made to non-Pennsylvania purchasers to be out-of-state regardless of whether they were shipped or picked up as dock sales.

the property and payroll factors, which many states, like Pennsylvania, have moved to eliminate. *See* Swain, 83 Tul. L. Rev. at 289-90.

Some of the issues related to Section 17 have been addressed through the UDITPA's special apportionment provision, Section 18, which provided a remedy in circumstances where application of the standard apportionment did not "fairly represent the extent of the taxpayer's business activity in the state." UDITPA Section 18; 72 P.S. § 7401(3)2.(a)(18).[46] Additionally, many states, including Pennsylvania, have addressed some apportionment issues by adding provisions relating to specific industries such as railroads. 72 P.S. § 7401(3)2.(b)-(e).

---

[46] Pennsylvania's Subparagraph 18 provides:

> If the allocation and apportionment provisions of this definition do not fairly represent the extent of the taxpayer's business activity in this State, the taxpayer may petition the Secretary of Revenue or the Secretary of Revenue may require, in respect to all or any part of the taxpayer's business activity:
>
> (A) Separate accounting;
>
> (B) The exclusion of any one or more of the factors;
>
> (C) The inclusion of one or more additional factors which will fairly represent the taxpayer's business activity in this State; or
>
> (D) The employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income. In determining the fairness of any allocation or apportionment, the Secretary of Revenue may give consideration to the taxpayer's previous reporting and its consistency with the requested relief.

72 P.S. § 7401(3)2.(a)(18).

However, scholars have observed that the dramatic change in the role of services in the United States economy has rendered the UDITPA's sales of services provision substantially outdated, requiring revision of Section 17. "Production has shifted steadily from goods to services and intangibles, and the forces of globalization, spurred by the revolution in communications technology, now allow many more goods and services to be supplied remotely." Swain, 83 Tul. L. Rev. at 287.

In response to the criticism of Section 17, states have enacted various revisions to address sales of services, including adopting language that more overtly allocates sales of services to the market where the service is received by the customer. For example, some states allocate sales of services based upon where the "benefit is received," " where "the receipt is derived," or, as in the 2013 revisions to the Pennsylvania Tax Reform Code, where "the service is delivered."[47] *See Corporate Executive Board Company v. Virginia*

---

[47] As revised for tax years after 2013, Subparagraphs 16.1 and 17 of the Pennsylvania Tax Reform Code provide in relevant part as follows:

(16.1)

(A) [Addressing sales from the sale, lease, rental or other use of real property]

(B) [Addressing sales from the rental, lease or licensing of tangible personal property]

(C)

(I) Sales from the sale of service, if the service is delivered to a location in this State. If the service is delivered both to a location in and outside this State, the sale is in this State based upon the percentage of total value of the service delivered to a location in this State.

(continued…)

*Department of Taxation*, 822 S.E.2d 918, 928-29 (Va. 2019) (surveying various states' amended provisions). Indeed, in July 2014 and 2015, the Commission adopted recommended amendments to the UDITPA in Article IV of the MTC which allocated services based upon whether "the service is delivered to a location in this state."[48]

> (II) If the state or states of assignment under unit (I) cannot be determined for a customer who is an individual that is not a sole proprietor, a service is deemed to be delivered at the customer's billing address.
>
> (III) If the state or states of assignment under unit (I) cannot be determined for a customer, except for a customer under unit (II), a service is deemed to be delivered at the location from which the services were ordered in the customer's regular course of operations. If the location from which the services were ordered in the customer's regular course of operations cannot be determined, a service is deemed to be delivered at the customer's billing address.

(17) Sales, other than sales under paragraphs (16) and (16.1), are in this State if:

> (A) The income-producing activity is performed in this State; or
>
> (B) The income-producing activity is performed both in and outside this State and a greater proportion of the income-producing activity is performed in this State than in any other state, based on costs of performance.

72 P.S. § 7401(3)2.(a)(16.1)-(17) (as amended).

[48] Information regarding the adoption of recommended amendments to the UDITPA, Article IV of the MTC, is available at https://www.mtc.gov/getattachment/The-Commission/Multistate-Tax-Compact/Model-Multistate-Tax-Compact-with-Recommended-Amendments-to-Art-IV.PDF.aspx (last accessed Nov. 23, 2022). While aspects of the Commission's recommended amendments overlap with Pennsylvania's addition of Subparagraph 16.1, there are substantial differences in structure and wording.

In light of this history of the UDITPA and its enactment in Pennsylvania, we consider the parties' arguments addressing Subparagraph 17's sourcing of services as applicable to Synthes' 2011 taxes, prior to Pennsylvania's 2013 revision of the Tax Reform Code.

## B.    Parties' Arguments

The OAG appeals from the Commonwealth Court's decision interpreting Subparagraph 17 as sourcing Synthes' services to the state where the customers received the benefit of the services and thus directing a remand for issuance of a refund based upon application of the Benefit-Received Method.  The OAG disputes this holding, arguing that the plain language of Subparagraph 17 dictates the use of the Cost of Performance Method, which Synthes employed in its original tax filing.

According to the OAG, the Commonwealth Court erred in deeming Subparagraph 17 ambiguous, based upon the lack of statutory definitions for the terms "income-producing activity" and "costs of performance."  While these terms are undefined, the OAG views them as plainly referencing the service provider rather than the customer.  It explains that "[t]he service provider conducts activities that produce income and the service provider incurs costs for those activities."  OAG Brief at 33.  In contrast, it argues that the language does not support application of the Benefit-Received Method because "[n]othing in the terms 'income-producing activity' or 'costs of performance' pertain to the 'customer'" or refer to "where the customer 'receives the benefit of the service.'"  *Id.* at 34.

The OAG also contrasts the language of Subparagraph 17, applicable to sales of services, with the distinct language of Subparagraph 16, applicable to sales of tangible personal property, which expressly dictates sourcing to where the "property is delivered or shipped to a purchaser."  72 P.S. § 7401(3)2.(a)(16).  It contends that the subparagraphs' "remarkably different language undercuts" the Commonwealth Court's

use of the same sourcing methodology for both provisions. OAG Brief at 17. It argues that "[t]he General Assembly knew how to indicate that a sale be sourced to the customer's location, because it did so in Subparagraph 16" and also in the recently enacted Subparagraph 16.1, applicable to tax years beginning in 2014. *Id.* at 35. The OAG rejects the Commonwealth Court's interpretation of the amendment as a "clarification" and, instead, cites this Court's observation that "[a] change in the language of a statute ordinarily indicate[s] a change in legislative intent." *Id.* at 37 (quoting *Masland v. Bachman*, 374 A.2d 517, 521 (Pa. 1977)).

The OAG draws support from the work of the Multistate Tax Commission and the various states that have revised their versions of Section 17 to adopt language that expressly sources sales of service to the customer. OAG contends that the Department acted *ultra vires* by imposing the Benefit-Received Method, which the OAG views as in conflict with the plain language of Subparagraph 17, rather than waiting for the Legislature to address the sourcing of services through the addition of Subparagraph 16.1.

Given that Subparagraph 17 derives from the UDITPA, a uniform statute, the OAG looks to its application by our sister courts, as well as by the Commonwealth Court. OAG Brief at 44 (citing 1 Pa.C.S. § 1927). It cites to courts in Indiana, Oregon, and Tennessee interpreting language similar to Subparagraph 17 as employing seller-based sourcing methodology and rejecting the consumer-based approach which the Department seeks to utilize in this case.[49]

The OAG deems improper the Commonwealth Court's deference to the Department's interpretation of Subparagraph 17. In addition to viewing the language as plain, the OAG rejects the reliance on deference where the Department neither promulgated its interpretation of Subparagraph 17 as a regulation nor even published it

---

[49] We address the cases cited *infra* at 49 n.52.

as official guidance prior to 2014, but instead was merely a practice utilized by the Department, a practice the OAG views as contrary to the plain language. OAG Brief at 46-47 (relying upon *Harmon v. Unemployment Comp. Bd. of Review*, 207 A.3d 292 (Pa. 2019) (plurality)). The OAG, therefore, urges this Court to reverse the Commonwealth Court and deny a refund to Synthes based upon its proper use of the Costs of Performance method of sourcing sales of services in its original 2011 tax filing.[50]

The Department responds in support of the Commonwealth Court's approval of its long-standing interpretation of Subparagraph 17 requiring the sourcing of a corporation's sales of services to the location where the customer receives the benefit of the transaction. In explanation, the Department turns to the disputed terms of Subparagraph 17, which source sales of services to the location where a corporation's "income-producing activity is performed," "based upon costs of performance." Dep't Brief at 34 (quoting 72 P.S. § 7401(3)2.(a)(17)).

The Department emphasizes the terms "perform" and "performance" and looks to their customary meaning as neither term is defined by the statute. *Id.* at 35 (citing 1 Pa.C.S. § 1903(a)(providing that words other than technical words should be construed "according to their common and approved usage")). The Department synthesizes various dictionary definitions of "perform" and "performance" as utilizing concepts of fulfilment, accomplishment, or completion. *Id.* As applied to Subparagraph 17, the Department reasons that "income-producing activity" is fulfilled, accomplished, or completed when and where the customer receives the benefit of the service. *Id.*

---

[50] The OAG is supported by *amici curiae* Allianz of America and Mastercard International Incorporated, both of which had appeals pending in Commonwealth Court at the time the briefs were filed seeking application of the Costs of Performance Method to their sales of services, as out-of-state corporations with Pennsylvania customers. Allianz provides statutory analysis, including comparing Pennsylvania's statute to those of our sister states, and Mastercard advocates against deference to the Department in the case at bar.

The Department contends that its interpretation is consistent with this Court's decision in *Gilmour* which viewed the sales factor as focused upon "the contribution of Pennsylvania consumers and purchasers to the entity's sales." Dep't Brief at 37 (quoting *Gilmour*, 822 A.2d at 683). While recognizing that this Court was not speaking to sales of services as controlled by Subparagraph 17, the Department argues that this logic applies to sales generally under the Tax Reform Code.

The Department additionally rejects the OAG's argument that the distinct language of Subparagraph 16 and Subparagraph 17 should be viewed as indicative of the intent to employ contrary sourcing methods. It contends that different language for sales and services resulted not from an intent to employ opposite sourcing methods but from a recognition of the distinct nature of tangible property and services. Specifically, it maintains that "tangible property could only ever be received by a customer in one state per sale, but since services can be received in multiple states there needs to be a way of locating the sale of those services for apportionment purposes." Dep't Brief at 48.

The Department next addresses the General Assembly's addition of Subparagraph 16.1 for tax years beginning in 2014. It observes that this Court opined that "[w]e cannot discern the legislative intent of the General Assembly that passed the relevant, prior version of the [statute] by examining the intent of the General Assembly that amended that statute."[51] *Id.* at 43 (quoting *Commonwealth v. Lynn*, 114 A.3d 796, 827 (Pa. 2015)).

---

[51] The Department also contends that the addition of Subparagraph 16.1 was not to change the location of the sourcing but rather to incorporate proportional allocation of sales of services through the phrase "based upon the percentage of total value of the service delivered to a location in this State," in place of Subparagraph 17's "all or nothing" allocation to the state with the "a greater proportion of the income-producing activity." 72 P.S. § 7401(3)2.(a)(16.1), (17). This language in the UDITPA's Section 17 has been criticized as it permits all sales of services "to be assigned to a state in which only ten percent of the income-producing activity occurs [even] if the remaining ninety percent of (continued…)

The Department refutes the OAG's statutory analysis of Subparagraph 17. It first emphasizes that the OAG is not entitled to deference in its interpretation of the Tax Reform Code as it, in contrast to the Department, is not the agency tasked with implementing the Code. It further asserts that by equating "income-producing activity" to the seller's location, the OAG's analysis improperly double counts the seller's location, which is already incorporated into the Pennsylvania portion of the property factor and the payroll factor, the weight of which factors the General Assembly has repeatedly reduced. The Department also avers that the OAG's interpretation would "penaliz[e] Pennsylvania-based businesses" while benefiting out-of-state service providers who do not have property and employees in Pennsylvania. Dep't Brief at 42.

Turning to our sister states' interpretations of their versions of the UDITPA, the Department rejects the OAG's reliance on the decisions from Indiana, Oregon, and Tennessee. It contends that the relevant regulations promulgated in these states overtly define or link "income-producing activity" to the seller or the taxpayer, regulations which are not present in Pennsylvania. Instead, it cites to several other states which utilize the customer's location to source sales of services.[52]

Before this Court, Synthes seeks our affirmance of the Commonwealth Court's decision remanding for issuance of a refund. It does not present its own statutory interpretation but rather argues that the Uniformity Clause requires that Synthes receive the same treatment, pursuant to the Benefit-Received Method, as did similarly situated taxpayers. It contends that the sourcing method applicable under Subparagraph 17 should not differ based on whether a corporation's refund petition is decided by the Board

---

the activity is divided evenly among the remaining ten states in which the taxpayer has operations." Swain, 83 Tul. L. Rev. at 304.

[52] We address the cases cited infra at 49 n.52.

of Finance and Revenue applying the Benefit-Received Method or in settlement negotiations with the OAG following an appeal to the Commonwealth Court.

### C. Analysis

As set forth above, Subparagraph 17 directs that sales of services are in Pennsylvania if "[t]he income-producing activity is performed in this State," or if the "income-producing activity is performed both in and outside this State and a greater proportion of the income-producing activity is performed in this State than in any other state, based on costs of performance." 72 P.S. § 7401(3)2.(a)(17). Unfortunately, the critical terms of this provision are undefined by the General Assembly. As advocated by the parties and as evidenced by the divergent interpretations of the Commonwealth Court's judges in this case, colorable arguments can be made that the "income-producing activity" occurs either where the taxpayer produces the service or where the customer receives the service.

To address this ambiguity, we attempt to determine the legislative intent through application of the rules of statutory construction. In so doing, we consider "the occasion and necessity for the statute" as well as the "object to be obtained." 1 Pa.C.S. § 1921(c). Moreover, because Subparagraph 17 derives from the UDITPA, which was intended to provide a uniform division of corporate net income between states, we attempt to construe the provision in conformity with other states which have enacted the uniform law. 1 Pa.C.S. § 1927.

This goal, however, is complicated in this case by developments since the initial drafting of the UDITPA that have reduced uniformity. Significantly, some states have adopted the MTC's Allocation and Apportionment Regulations related to Section 17, which define the relevant terms "income-producing activity" and "costs of performance" with definitions phrased in terms of the taxpayer's production activity rather than the

consumer's market-based activity.[53]  Pennsylvania, in contrast, has not adopted these regulations.  Moreover, many states, like Pennsylvania, have diverged from the UDITPA, by altering the weighting of the property, payroll, and sales factors and by incorporating provisions addressing specific service industries, such as financial services or telecommunications.  *See* Swain*, 83 Tul. L. Rev. at 319.

States additionally have enacted alternative language to source sales of services, with many adopting an overtly market-based approach, but not with uniform terminology. Instead, some states source sales based on "where the benefit is received, others where the service is delivered, and still others where the receipts are derived."  *See Corporate Executive Board Company*, 822 S.E.2d at 922.  These amendments are not surprising as the UDITPA was drafted to address a very different economy, with seemingly minimal focus on services as evidenced by the absence of commentary for Section 17, in contrast to other provisions of the UDITPA.  *See UDITPA with 1966 Comments*, Section 17, supra 35 n.38.

Accordingly, we find that the relevance of other states' interpretation of their sales of services provisions somewhat diminished given the variations in the regulations adopted and the amendments enacted, which all result in reduced uniformity.  As stated by the Virginia Supreme Court, "[i]n a union comprised of 50 sovereign States, it is nearly inevitable that States will devise differing taxation schemes and, indeed, that is the case." *Corporate Executive Board Company*, 822 S.E.2d at 925.[54]

---

[53]  MTC, Allocation and Apportionment Regulation IV. 17 (adopted 1973, revised 2007), https://www.mtc.gov/uploadedFiles/Multistate_Tax_Commission/Uniformity/Uniformity_ Projects/A_-_Z/AllocaitonandApportionmentReg.pdf (last accessed Nov. 23, 2022).

[54]  While we fail to find a uniform application for the reasons set forth above, we nevertheless recognize the thoughtful analysis of many of our sister states that have struggled with issues relating to sourcing sales of services.

(continued…)

We observe that the following states have deemed their statutes and/or regulations to provide for origin sourcing to the taxpayer's location: *University of Phoenix, Inc. v. Indiana Department of State Revenue*, 88 N.E.3d 805 (Ind. T. C. 2017) (determining that online-college revenue should not be sourced to the student's billing address based upon statutory language nearly identical to Subparagraph 17, as informed by regulations defining "income-producing activity" as "act or acts directly engaged in by the taxpayer for the ultimate purpose of obtaining gains or profit," as well as other regulations which the court viewed as focused upon the seller rather than the consumer's activities); *Honigman Miller Schwartz & Cohn LLP v. City of Detroit*, 952 N.W.2d. 358 (Mich. 2020) (applying Michigan's Uniform City Income Tax Ordinance employing the term "services rendered in the city," in light of Michigan's prior version of the UDITPA, which, like Subparagraph 17, utilized the concept of "income-producing activity performed in this state," and concluding that the city tax provision "encompasses all legal services performed, i.e., done or carried out, within the city without regard to where those services are delivered" but recognizing the national trend toward statutory revisions adopting market-based sourcing); *AT & T Corp. v. Department of Revenue*, 358 P.3d 973 (Or. 2015) (acknowledging the ambiguity inherent in Section 17 of the UDITPA but applying a production rather than market-based interpretation to statutory language identical to Subparagraph 17 due in part to Oregon's adoption of MTC model regulations defining "income producing activity" with reference to "activity directly engaged in by the taxpayer" and "costs of performance" also with reference to the "accepted conditions and practices in the trade or business of the taxpayer."); *Vodafone Arms. Holdings. Inc. v. Roberts,* 486 S.W.3d 496, 513 (Tenn. 2016) (approving of Department of Revenue's authority to use a variance statute (similar to Pennsylvania's Subparagraph 18) to impose a market based taxation on a specific company, despite recognizing that "[f]or purposes of this appeal" it was undisputed that the Cost of Performance Method of sourcing applied to Tennessee's statute with language nearly identical to Subparagraph 17 (but phrased as "earnings-producing activity")); *Sirius XM Radio, Inc. v. Hegar*, 643 S.W.3d 402 (Tex. 2022)(interpreting statutory language as imposing origin-sourcing based upon the location of the taxpayer's employees and equipment, where the statute apportioned to Texas the "receipts from ... each service performed in this state;" and rejecting allocation based upon the "receipt-producing, end-product act" of the customers receiving the satellite radio service in Texas); *Corporate Executive Board Company v. Virginia Department of Taxation*, 822 S.E.2d 918 (Va. 2019) (applying statutory provision with language nearly identical to Subparagraph 17 as utilizing Costs of Performance Method of sourcing).

Conversely, the following courts have found their statutes and/or regulations to provide for market or destination sourcing, generally to the customer's location: *Walter E. Heller Western, Inc. v. Arizona Dep't of Revenue*, 775 P.2d 1113, 1116 (Ariz. 1989) (applying language identical to Subparagraph 17 (without the MTC's model regulations) and concluding that "income-producing activity" entails only "direct sales payment activity by the consumer" when read in conformity with Arizona's other regulations sourcing sales for specific industries to the situs of the consumer); *Lutheran Brotherhood Research Corp. v. Commissioner of Revenue*, 656 N.W.2d 375 (Minn. 2003) (attributing fees related to (continued…)

Instead, we find it more relevant to read Subparagraph 17 in the context of the Tax Reform Code's other provisions addressing the apportionment of income, and especially its allocation of sales, as interpreted by this Court. 1 Pa.C.S. § 1932 (instructing that statutes relating to the same subjects should be read *in pari materia*). As discussed above, this Court in *Gilmour* adjudicated an issue related to sales of tangible personal property controlled by Subparagraph 16. In so doing, we observed that the corporate net income apportionment provisions generally aimed to "measure the amount of commercial activity that an entity engages in during a given year and tax it accordingly." *Gilmour*, 822 A.2d at 683.

As has been noted, the proportion of a corporation's commercial activity in Pennsylvania is measured, as least initially and in 2011, by looking to the corporation's property, payroll, and sales in Pennsylvania as compared to its property, payroll, and sales as a whole. 72 P.S. § 7401(3)2.(a)(15). The activity relevant to the property and

mutual fund management services to the location of the trustee of the funds (which was deemed the consumer of the services) rather than to the ultimate investors of the funds based upon statutory language sourcing receipts from services to "the state in which the benefits of the services are consumed"); *Bank of America Consumer Card Holdings v. State of New Jersey Division of Taxation*, 29 N.J.Tax 427 (N.J.Tax, 2016) (deeming the phrases "services performed within the State" and "all other business receipts ... earned within the State" to direct the sourcing of interest income and credit card fees to the New Jersey domicile of the credit card holders based in part on regulations addressing the relevant transactions); *DIRECTV, Inc. v. South Carolina Dep't of Revenue*, 804 S.E.2d 633, 640 (S.C. App. 2017) (interpreting statutory language instructing that receipts from services are "attributable to this [s]tate to the extent the income-producing activity is performed within this [s]tate" and concluding that the "income-producing activity" was the "delivery of the signal to the customer as it actually generate[d] income" rather than the location of the service's employees as the fees paid by the subscribers reasonably represented DIRECTV's business activity in South Carolina"); *Ameritech Publishing, Inc. v. Wisconsin Dep't of Revenue*, 788 N.W.2d 383 (Table), 2010 WL 2519583, at *1 (Wis. Ct. App. 2010) (interpreting the allocation of services to the state in which the "income-producing activity is performed" and applying a market-based analysis to conclude that the relevant income producing activity for a telephone directory was "the furnishing of access to a Wisconsin audience via advertisements," regardless of where the taxpayer's employees created the directory).

payroll factors is the production process to the extent it is occurring within the state borders, whereas the activity relevant to the sales factor is that of the state's consumers buying the good, service, or other product. *See* Swain, 83 Tul. L. Rev. at 288 ("The property and payroll factors are intended to give weight to the states in which production occurs ('origin' states), while the sales factor is intended to give weight to the states that provide the market for the taxpayer's products ('market' states or 'destination' states)."); *see also AT & T Corp.*, 358 P.3d at 980 (distinguishing property and payroll factors', which "estimate the state's share of responsibility for the income stream by focusing on production" from the sales factor, which "generally tracks the extent to which the taxpayer takes advantage of the taxing state's market").

Addressing the sales factor specifically, we opined in *Gilmour* that "the numerator of the sales factor represents the contribution of Pennsylvania consumers and purchasers to the entity's sales, while the denominator represents the contribution of all consumers and purchasers." *Gilmour*, 822 A.2d at 683. Notably, Subparagraph 15's sales factor encompasses both Subparagraph 16's sales of tangible personal property and Subparagraph 17's sales other than tangible personal property, such as sales of services. It would be incongruous to apply diametrically opposed sourcing methods to Subparagraph 15's component parts by applying destination sourcing to Subparagraph 16 but origin sourcing to Subparagraph 17.

While the Legislature's use of different language in provisions is often an indication that it intended different results, *see Commonwealth v. Elliot*, 50 A.3d 1284, 1290 (Pa. 2012), it can also be a product of the inapplicability of the same terminology to the subjects addressed in those provisions. In this case, the simple directive of Section 16 to source a sale to "where the property is delivered or shipped" applies coherently to a concrete good that is either in one place or another. The same cannot be said for most

services.  While a physical location can be assigned for some services, such as a haircut, many services in today's economy do not exist in a physical location, as one would have difficulty locating the physical presence of the legal services provided to Synthes' customers.

The drafters of the UDITPA, as adopted by the General Assembly, addressed this conundrum of the sales of services through the term "income-producing activity" in Subparagraph 17.  Unfortunately, the meaning of this term is far from clear, as evidenced by the strong arguments of both parties before this Court.  By reading Subparagraph 17 in conjunction with Subparagraphs 15 and 16, however, we find the Department's interpretation most compelling as it locates the sale of services to where the service is fulfilled and the income finally produced, which is at the customer's location, in conformity with Section 16's treatment of sales of tangible personal property.   Moreover, commentators have observed that not all products can be easily categorized as a tangible product or a service.  Swain, 83 Tul. L. Rev. at 306 (observing the existence of "mixed (services/goods) transactions").  The difficulty in classifying these mixed transaction further counsels in favor of interpreting Section 16 and 17 as using the same sourcing method.  As noted, this destination sourcing conforms to the guiding principle for sourcing sales identified in *Gilmour*, which is to determine "the contribution of Pennsylvania consumers" to the net income of the corporation, which requires a focus upon the consumers' location.

We additionally do not view the 2013 amendments as an attempt to alter the general framework for sourcing sales, but rather as an attempt to clarify the sourcing of sales of services to the point of delivery to the consumer, and to explain the application in specific situations where the point of delivery may be unclear, as well as to address a multitude of specific scenarios, including sales of real property and sales from licensing

of tangible personal property. Given our conclusion that the language of Subparagraph 17 supports the Department's application of the Benefit-Received Method, we observe that application of this method has the added benefit of providing continuity for taxpayers as the Department's consistent application of destination sourcing for similarly situated taxpayers prior to 2014 will continue for taxpayers in 2014 and after.

For all the reasons set forth above, we affirm the order of the Commonwealth Court remanding for issuance of a refund to Synthes in regard to its 2011 corporate net income tax.

Justices Wecht and Mundy join the opinion.

Chief Justice Todd files a concurring opinion.

Justice Dougherty files a concurring and dissenting opinion.

The Late Chief Justice Baer did not participate in the decision of this matter.

Justice Brobson did not participate in the consideration or decision of this matter.